**Edward MENNETI, Administrator of the Estate of Marc Albert Warner, Deceased, Plaintiff,**

v.

**EVANS CONSTRUCTION COMPANY**
and
**William M. Cadman and William Morrow, trading as Morrow's Contracting Company, Defendants.**

**No. 16400.**

United States District Court
E. D. Pennsylvania.
March 10, 1958.

Maximillian J. Klinger, Philadelphia, Pa., for plaintiff.

Hodge, Hodge & Cramp, Media, Pa., by John F. Cramp, Ralph B. D'Iorio, Media, Pa., for Evans Const. Co.

Swartz, Campbell & Henry, Philadelphia, Pa., by Joseph Head, Jr., Philadelphia, Pa., for Morrow Contracting Co.

KRAFT, District Judge.

This diversity action to recover damages for the death of a minor by drowning is governed by the substantive law of Pennsylvania. The jury rendered a verdict against both defendants, awarding damages of $45,000 in the survival action and $385 in the wrongful death action. Decision was reserved on defendants' motions for directed verdict at the close of all the evidence. Defendants filed post-trial motions, under F.R. C.P. 50(b), 28 U.S.C.A., for judgment n. o. v. or, alternatively, for a new trial.

Viewing the evidence in the light most favorable to the plaintiff, the essential facts may be thus summarized:

Marc Albert Warner, aged 7, a normal boy of slightly more than average intelligence, was drowned about 5:00 p. m. on May 27, 1953 when he slipped or fell into a rain-filled ditch on the land of Evans Construction Company (Evans), one of the defendants.

Preparatory to development of this land, which it had owned for less than a year, Evans had had a number of large trees cut down. Thereafter, shortly before May 21, 1953, Evans contracted with the other defendant, Morrow's Contracting Company (Morrow), to have Morrow, an independent contractor, bury the tree stumps near the rear of Evans' tract. Morrow was to use its bulldozer to excavate a ditch into which the stumps were to be pushed and covered with earth.

Evans' land fronted on Hutchinson Terrace, a rough, unimproved street in Holmes, Delaware County. Hutchinson Terrace was about 2 feet higher than the intended excavation site. The intervening ground of Evans was generally low and uneven, sloping slightly downward toward the proposed ditch site, 132 feet to the east. Lawton Terrace, the next street, was east of and parallel to Hutchinson Terrace and was 225 feet from and about 6 feet higher than the site of the proposed ditch. The ground between Lawton Terrace and the ditch site, most of which was not owned by Evans, sloped moderately downward in a westerly direction and was, in part, overgrown with trees and brush. The surrounding area, though not densely populated, was residential in character. For several years neighborhood children had, from time to time, played upon and traversed Evans' and appurtenant vacant land. Children, including Marc, played upon Evans' land in the afternoon of the first day the work of excavation was in progress.

Morrow's bulldozer operator, Forrester, began work about 8:30 a. m. on May 21, 1953. On that day he excavated a ditch about 80 feet long, 12 feet wide and 6 feet deep, with an earthen access ramp at one end. He pushed many stumps into the ditch and covered them. However, he was unable to complete the job that day and, when he stopped work about 4:30 p. m., he left, unfilled, a portion of the ditch about 15 to 20 feet long with a maximum depth of 6 feet. When Forrester ceased work in the late afternoon of May 21, intending to resume the work on the following morning, this unfilled section of the ditch was dry.

The next morning, May 22, it rained. Forrester did not resume the work, as he had intended, because of the rain and his conviction that it would be too muddy for operation of the bulldozer. The amount of that day's rainfall in the vicinity of

Holmes is unknown. Measurements, in inches, made at five Philadelphia weather stations, variously located from about 4 to 12 miles from Holmes, varied from .70 to .89.

Saturday, May 23 and Sunday, May 24, were weekend holidays on which Forrester did not work. It rained early Saturday morning, but clear, sunny weather prevailed on the rest of that day and on Sunday. The quantity of rainfall in Holmes on Saturday morning is not known. Measurements made at the five Philadelphia weather stations showed the following differences in the Saturday morning rainfall: Drexel Institute .70; International Airport .13; Point Breeze .13; Shawmont (Fairmount Park) 1.63; Custom House .73. International Airport, about 4 miles from Holmes, was the closest of these stations to the ditch site.

Monday, May 25, dawned clear. Forrester returned to resume the work, but found that someone had tampered with the bulldozer which he had parked beside Hutchinson Terrace. He was unable to start the motor and a mechanic was sent from Morrow's shop to assist him. Meanwhile, Forrester concluded that it was too muddy to use the bulldozer in any event and, at the request of Evans, the bulldozer was removed by Morrow's trailer to another Evans' job elsewhere in the county. Later, during that day it rained, and that fall was measured in Philadelphia as follows: Drexel Institute .17; International Airport .32; Shawmont, a trace. The amount of rainfall in Holmes is unknown.

Tuesday, May 26, was a rainy day. The amount of rainfall in Holmes was not ascertainable. All five Philadelphia stations recorded more than 1 inch. Point Breeze station recorded 1.63 and the Custom House station 1.24.

Wednesday, May 27, was, for the most part, a sunny day, though a slight shower of negligible quantity was noted at the Drexel Institute weather station. Late that afternoon Marc and a young playmate entered upon Evans' land to look for tadpoles. Coming upon the ditch nearly filled with muddy water, they began to float sticks in it. While Marc's playmate was momentarily absent, Marc slipped or fell into the water and was seen by his returning playmate as he disappeared beneath the surface.

No one saw or examined the ditch after 4:30 p. m. on May 21, nor was anyone aware of the accumulation of water therein, until the arrival of Marc and his playmate in the late afternoon of May 27. The water in the ditch accumulated from the run-off of the heavy rainfall of May 26 upon land so saturated from the rains, which fell before and on May 25, as to prevent further absorption of water. The maximum depth of the water when Marc fell in was 5 feet 2 inches.

### Motion for Judgment N.O.V.

Plaintiff relies on Section 339 of the Restatement of Torts for recovery, contending that both Evans and Morrow were possessors of the land and that all the conditions prescribed by § 339 existed; or that, if Morrow was not a possessor, its liability was that of the creator of the condition and so, under § 384, identical with the liability of the possessor. Defendants insist that plaintiff failed to prove the existence of the conditions necessary to impose liability under § 339. Evans further contends that it was not in possession and that Morrow, as an independent contractor, was in sole possession.

It is essential to determine first whether the evidence was sufficient to sustain a finding that Evans was a possessor of the land involved, since its liability attaches under § 339 only if it was a possessor. On the one hand the evidence was sufficient to permit the jury to find that Evans did not surrender complete possession of the land to Morrow, but only permitted Morrow to enter into joint possession with Evans. This finding could be founded on a consideration, inter alia, of the area in which Morrow's work was to be done, the kind of work to be done, the brief period in which it could be accomplished, the lack of any agreement or necessity either to give Morrow sole possession or wholly to divest Evans'

possession during Morrow's performance of the work. On the other hand there was adequate evidence from which the jury could conclude that, if Morrow did take sole possession on May 21, that possession changed on May 25, to a possession by Evans alone or to a possession by Evans and Morrow jointly when, on that date, Morrow removed his bulldozer and its operator, at Evans' behest, from that land to another Evans' job located elsewhere. Whether Evans was a possessor of the land was a question which the jury had to resolve from the evidence. The verdict answered that question adversely to Evans' contention.

Defendant, Evans, appears to feel that the result in Patterson v. Palley Mfg. Co., 1948, 360 Pa. 259, 61 A.2d 861, affords some support to its contention that the intervention of an independent contractor, per se, negates the owner's possession. Examination of the opinion [1] in that case reveals, however, that the trial judge, for reasons not apparent in the opinion, directed a verdict for the defendant owner and the jury rendered a verdict only against the independent contractor. The action of the trial judge was not challenged by the other parties. What evidence of the owner's possession was before the trial judge when he gave binding instructions is not stated.

■ The law of Pennsylvania [2] governing the liability of a possessor of land for the death of a child trespasser is stated, as these parties appear to agree, in § 339 of the Restatement of Torts, which provides:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

■ The evidence sufficiently established that Marc was a child trespasser whose death was caused by an artificial condition which then *existed* on Evans' land; that Evans was a possessor of the land; that Morrow was either a possessor of the land or, under § 384 [3] of the Restatement, was one who, on behalf of the possessor, created *a condition* thereon and so became subject to the same liability and enjoyed the same immunity therefrom as the possessor.

The defendants' first contention is that the possessor of this land, whether Evans, Morrow or both, did not, within the meaning of § 339, *maintain* the artificial condition which caused the child's death.

The thrust of the plaintiff's opposing contention is that, under the circumstances of this case, the defendants should be held to *maintain* the condition from the moment they acquired actual or constructive knowledge of its existence. We think this argument misinterprets the pivotal word "maintain".

---

1. 360 Pa. at page 263, 61 A.2d at page 863.

2. Thompson v. Reading Co., 1942, 343 Pa. 585, 23 A.2d 729; Bartleson v. Glen Alden Coal Co., 1949, 361 Pa. 519, 64 A.2d 846; Kravetz v. B. Perini & Sons, 3 Cir., 252 F.2d 905.

3. "One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to the same liability, and enjoys the same immunity from liability, as though he were the possessor of the land, for bodily harm caused to others within and without the land, while the work is in his charge, by the dangerous character of the structure or other condition."

The meaning of "maintain" in like context was defined in O'Connell v. Kansas City, 1921, 208 Mo.App. 174, 231 S.W. 1040, 1041. There the court, after an extensive review of definitions, said: "From the foregoing definitions of the word 'maintain' it is apparent that to maintain a defect means something more than mere notice or even knowledge of the defect. It means keeping up, preserving, or continuing the defective condition, and suggests some active participation in the matter of continuing the condition." In a slightly different context, it was said in Morris v. American Liability & Surety Co., 1936, 322 Pa. 91, 94, 185 A. 201, 202: " * * * (m)aintain means to preserve or keep in an existing state or condition * * *."[4]

■ As employed in § 339 and applied to the facts of this case "maintain" must be construed to mean an intentional retention of an artificial condition which the possessor did not create, after the possessor had actual or constructive knowledge of its existence. Absent any expression of such intent by the possessor, there must at least be evidence of acts or conduct of the possessor from which such an intent may be inferred. If the only conduct relied on to support such an inference is the possessor's inaction, then such inaction must continue for a sufficient period of time after the possessor acquired actual or constructive knowledge of the existence of the artificial condition to permit that inference reasonably to be drawn.

The evidence establishes that neither defendant had actual knowledge of the presence of any water in the ditch. It is clear from the testimony of Francis K. Davis, Jr.,[5] which is the only evidence on the subject, that the accumulation of water in the ditch to a depth sufficient to cause drowning resulted from the rainfall of May 26. The rise to such a depth necessarily was not instantaneous, but gradual. The evidence does not establish at what hours the rainfall of May 26 be-

gan and ended. At best, the jury could reasonably have inferred only that the water reached a depth sufficient to cause drowning from 6 to 30 hours before the advent of the trespassing children. The evidence permitted no more accurate an appraisal of the probabilities.

■ Assuming then, without deciding, that at some unascertainable point of time between 11 a. m. on May 26 and 11 a. m. on May 27, the defendants should reasonably have foreseen that rainwater would collect and remain in the ditch in sufficient depth to cause drowning, did the defendants, by inaction after the moment of acquisition of such constructive knowledge *maintain* the artificial condition? We think not.

■ It was the plaintiff's burden to show by a fair preponderance of the evidence a continued existence of the artificial condition, after defendants acquired constructive knowledge, for a sufficient period of time to permit the inference reasonably to be drawn that defendants intentionally retained or kept the artificial condition in existence. This burden was not met.

The time of defendants' acquisition of constructive knowledge was critical to a determination of the duration of defendants' subsequent inactivity. On this crucial question, if plaintiff's premise of foreseeability is accepted, the evidence at most shows an improbability that defendants had constructive knowledge for more than thirty hours, a probability that they had it for as much as six hours, but only a possibility that they had constructive knowledge for more than six but not more than thirty hours. No inference of defendants' intention to keep the condition in existence could reasonably be drawn from its continued existence for six hours after constructive knowledge. Beyond six hours the jury, on this evidence, could only speculate; it could not, with reason, determine at what time between 11 a. m. on May 26 and the same hour on May 27 the defendants should

---

4. See Girard Trust Co. v. United States, 3 Cir., 1947, 161 F.2d 159, 162, for definition in a contractual context.

5. Pp. 230, 231, 245.

have known the condition would or did exist.

Plaintiff's assertion that this places a harsh burden on plaintiff, ignores the fact that the problem arises from the very short interval of time involved. To hold otherwise and permit speculation on possibilities to be substituted for proof, at least, of probabilities would place an even heavier burden on defendants and deprive them of their right to require plaintiff to meet the burden of proof which the law imposes on him.

Plaintiff relies on the time element in Patterson v. Palley Mfg. Co.,[6] supra, to support his interpretation of "maintain". However, in that case, which involved the collapse of a wall of a partially demolished stable, the defendant contractor accepted without protest the plaintiff's assumption that defendant "maintained" the structure. The case was decided in a far different factual setting in which the question of the meaning and application of "maintain" was not raised by the defendant or discussed or decided by the court. The prime contested issue there was the foreseeability of the danger. The policy of the Pennsylvania Supreme Court to refrain from deciding issues not presented by assignments of error is too well known to require citation.

The defendants next urge that plaintiff failed to meet condition (b) of § 339, which requires the artificial condition on the land to be one of which the possessor knows or should know and one which he realizes or should realize involves an unreasonable risk of death or serious bodily harm to child trespassers.

There was no evidence that defendants had actual knowledge that there was any water in the ditch. However, plaintiff contends that the evidence was sufficient to support a finding that defendants should have known that water would thus accumulate and remain in the ditch to a depth which defendants should have realized involved an unreasonable risk of death or serious bodily harm to young trespassers. Under the evidence in the instant case this would attribute to a reasonable person a remarkable quality and degree of prescience uncommon to mankind. Such perception is the habitual handmaiden of hindsight.

The artificial condition which caused this lad's death was not the dry, empty ditch which Forrester left unfilled on May 21, but the accumulation therein of water to a depth sufficient to cause drowning. It is true, as plaintiff points out, that, absent the ditch, the water could not have so collected. However, defendants did not fill the ditch with water nor cause it to be so filled. The water accumulated to such a depth as the result of a run-off of rainfall on May 26, because earlier rains had so saturated the soil that further absorption was then impossible.

It may fairly be said that the defendants reasonably should have known *some* water would accumulate in the ditch from the rainfall, but the evidence was insufficient to permit the jury to find, with reason, that the defendants should have known that water from rain on intermittent days in late May would accumulate and remain, unabsorbed, in the ditch to an extent which defendants should have realized involved an unreasonable risk of death or serious bodily harm to young trespassing children. As the evidence amply demonstrated, the volume of rainfall can and did vary widely in the space of a very few miles. Neither the defendants nor their employees were shown to have been in or sufficiently close to Holmes to have had any knowledge of the volume of rainfall there on May 22, 23, 25 or 26.

Finally, defendants contend that lakes, streams, ponds, pools and other waters embody perils which, under Pennsylvania law, are deemed obvious to children of the tenderest years and that no liability attaches to a possessor of land by reason of the resultant death of a child trespasser who comes upon the land to play. If this is the law of Pennsylvania then

6. 1948, 360 Pa. 259, 61 A.2d 861.

clearly plaintiff did not, and in fact could never, fulfill the second alternative of condition (c) of § 339.

 Pennsylvania decisions in actions for the death of a minor child by drowning appear to be in irreconcilable conflict.[7] Some of the cases involved children who were licensees, but the possessor's duty to a child licensee is no less than to a child trespasser. The status, as licensee or trespasser, of a child is immaterial to the child's capacity to realize danger. Lacking a clear expression by the Pennsylvania Supreme Court, it cannot be said that judicial adoption of § 339 of the Restatement of Torts resolved the existing conflict. Section 339 deals generally with all dangerous conditions maintained by a possessor of land and, all other conditions co-existing, imposes liability if trespassing children, because of their youth, do not realize the risk involved. But, Pennsylvania courts had already decided in several cases that the dangers inherent in pools, ponds and other bodies of water were deemed obvious to children of the tenderest years; in short, that even children of tender years were presumed, by Pennsylvania law, to realize the risk involved. Counsel have cited and we are able to find no case which expressly overrules these decisions. One case, Altenbach v. Lehigh Valley R. Co., 1944, 349 Pa. 272, 37 A.2d 429, appears to ignore the presumption; yet, less than three months later, in Simon v. Hudson Coal Co., 1944, 350 Pa. 82, 38 A. 2d 259, the same court, per curiam, affirmed the judgment *on the opinion of the court below.* That lower court opinion,[8] in part, quoted and relied upon two Pennsylvania Superior Court decisions,[9] and

emphasized by italics the quoted statements that bodies of water embody perils deemed obvious to children of the tenderest years, and that a property owner, with knowledge of the habit of children to visit waters upon his property, is as a rule under no obligation to erect barriers or to take other measures to prevent their injury thereby.

 Where the rule of decision is the state law, a federal court exercising diversity jurisdiction may declare that law even though it has not been expounded by the state's highest court; but, in so doing, a federal court must declare what, from all available data, it believes the state court would decide, rather than what it believes the state court should decide. Fidelity Union Trust Co. v. Field, 1940, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109; West v. American Tel. & Tel. Co., 1940, 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139. However, when the decisions of the highest state court appear to be in irreconcilable conflict, it would be a gratuitous act of doubtful wisdom for a federal court *unnecessarily* to declare the the state law before the state's highest court had resolved the conflict in its own decisions. Since defendants' n. o. v. motions here may be decided on other grounds which involve no declaration by this court of the state law on the defendants' last contention, we refrain from passing thereon.

### Sur Motions for New Trial

The defendants, in support of their alternative motions for new trial, press only two of the several reasons assigned. They urge, first, that the verdicts were against the weight of the evidence; second, that the verdict in the survival ac-

7. Among cases holding liability are Barthold v. Philadelphia, 1893, 154 Pa. 109, 26 A. 304; Altenbach v. Lehigh Valley R. Co., 1944, 349 Pa. 272, 37 A.2d 429.

Among cases holding no liability are Gillespie v. McGowan, 1882, 100 Pa. 144; Le Grand v. Wilkes-Barre & W. V. Traction Co., 1899, 10 Pa.Super. 12; Ansell v. City of Philadelphia, 1923, 276 Pa. 370, 120 A. 277; Dornick v. Wierton Coal Co., 1933, 109 Pa.Super. 400, 167 A. 617; Pietros v. Hecla Coal & Coke Co., 1935,

118 Pa.Super. 453, 180 A. 119; Murdock v. Pennsylvania Railroad Co., 1942, 150 Pa.Super. 156, 27 A.2d 405; Simon v. Hudson Coal Co., 1944, 350 Pa. 82, 38 A.2d 259.

8. 350 Pa. 82, 85, 86, 38 A.2d 259.

9. Dornick v. Wierton Coal Co., 1933, 109 Pa.Super. 400, 404, 167 A. 617; Murdock v. Pennsylvania Railroad Co., 1942, 150 Pa.Super. 156, 169, 27 A.2d 405.

tion was excessive. Both reasons have merit.

■ From careful observation throughout the trial, as well as from review of the trial record, the trial judge is convinced that the verdicts were against the weight of the evidence and that the jury, despite a conscientious effort, was unable to free itself from an understandable sympathy and compassion sufficiently to permit it to determine this case dispassionately.

■ The defendants' attack on the $45,000 verdict as excessive is hinged on the apparent assumption that, in this diversity case, Pennsylvania decisions on the question of excessiveness are controlling. Such an assumption would be incorrect. In the administration of diversity jurisdiction a federal district court " * * * (p)roperly applies state rules in instructing the jury as to the measure of damages or, more particularly, in identifying these items of injury or loss which may legally be recovered as damages. But otherwise, any claim that the verdict has been excessive requires a trial court to decide no more than whether the jury has reached a result which could rationally and dispassionately be reached by laymen on the basis of evidence relevant to the several categories of legally recoverable damage. * * * It may well be that experience with other cases and familiarity with rulings of other judges upon other verdicts has helped shape the trial judge's conception of the limits of an honest and rational award in the circumstances of the case at hand. But such exercise of professional judgment and judicial discretion is not the application of any rule of law, state or federal." Lebeck v. William A. Jarvis, Inc., 3 Cir., 1957, 250 F.2d 285, 287–288.

Since the present jury was required to apply Pennsylvania law as to the measure of damage, jury verdicts and judges' rulings elsewhere can be of no aid, unless the same rule of damage was applied. Whether for this reason or because of a misconception that Pennsylvania decisions on excessiveness are controlling, counsel for plaintiff and defendants have ably and extensively reviewed the Pennsylvania cases. In no case cited, involving a minor's death, did any Pennsylvania jury award a verdict which could be fairly said to approach the instant verdict in amount. This interesting but inconclusive disclosure may, perhaps, have been the result of evidence not fully revealed in the text of the reported decisions. The higher verdicts in those cases were invariably reduced by the trial court, the Supreme Court or by both.[10]

■ Weighing with care all the evidence in this case independently of the Pennsylvania decisions, but mindful of experience with other cases and familiarity with rulings of other judges upon other verdicts resulting from the application of the same damage rule, it is the conclusion of the trial judge that the verdict of $45,000 exceeded the limits of a rational award in the circumstances of this case.

Accordingly an order would be entered setting aside the verdict and judgment and granting the defendants a new trial, except for the entry, necessitated by the defendants' other motions, of the following:

### Order

Now, March 10, 1958, it appearing that defendants' motions for directed verdicts should have been granted, the judgments entered on the verdicts in favor of the plaintiff and against the defendants are reopened, and it is ordered and directed that judgments be now entered in favor of the defendants and against the plaintiff as if the verdicts requested by the defendants had been directed.

10. Hankins v. Mack, 1950, 364 Pa. 417, 72 A.2d 268. Verdict of $30,000 for the death of a 9 year old boy was reduced to $20,000 by the trial court and to $15,000 by the Supreme Court.

Fries v. Ritter, 1955, 381 Pa. 470, 112 A.2d 189. Verdict of $24,204.50 for the death of a 4½ year old boy was reduced to $18,000.